2006 BNH 046

_____

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | Bk. No. 00-13400-MWV |
| | Chapter 7 |
| Thomas Neal and | |
| Peggy A. Neal, | |
|         Debtors | |
| | |
| Thomas Neal and | |
| Peggy A. Neal, | |
|         Plaintiffs | |
| | |
| v. | Adv. No. 05-1183-MWV |
| | |
| New Hampshire Higher Education | |
| Assistance Foundation, | |
|         Defendant | |

*Brian R. Barrington, Esq.*
*THE COOLIDGE LAW FIRM, PLLC*
*Attorney for Plaintiffs*

*Clifford Gallant, Jr., Esq.*
*BELIVEAU, FRADETTE, DOYLE & GALLANT, P.A.*
*Attorney for Defendant*

## **MEMORANDUM OPINION**

     Before the Court is the Debtors' complaint seeking an undue hardship discharge of their student loans pursuant to section 523(a)(8).[1] The Court held a trial on August 17, 2006, at which Mrs. Neal testified under oath. At the close of the trial, the Court took the matter under advisement and asked the New Hampshire Higher Education Assistance Foundation (the "Defendant") to submit a supplemental statement regarding the original due date of the loan payments, which the Defendant did. For the reasons set forth below, the Court holds that the Debtors have met their burden under section 523(a)(8) and that the student loans are dischargeable.

---

[1] All references to the "Bankruptcy Code" or to specific sections are to the Bankruptcy Reform Act of 1978, as amended prior to April 20, 2005, 11 U.S.C. §§ 101-1330.

## JURISDICTION

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## BACKGROUND

The Debtors are seeking to discharge Mrs. Neal's student loans that totaled approximately $22,570.32 on the date of filing. This loan debt consists of six individual Stafford loans dated between August 1996 and September 1998, and all loans are held by the Defendant. According to the Defendant, the amount due as of August 15, 2006, was $30,449.67, with monthly payments of $524 over sixty-three months.

### I. Bankruptcy

The Debtors filed a Chapter 13 petition on December 11, 2000, and on February 22, 2002, the Court confirmed their sixty-month plan. Although the plan payments, based on disposable income, were low—seventy dollars—the student loans were to be fully satisfied with a lump sum payment upon the settlement of a personal injury action. The Connecticut attorney retained to pursue the tort action, though, apparently defaulted the case. The Debtors converted their case to Chapter 7 on July 26, 2005, after, as Mrs. Neal testified, they knew they could no longer rely on the personal injury suit. At or about the time of conversion, the Debtors were substantially into their sixty-month plan, having made at least forty-seven of fifty-two required payments, albeit not always on time. The Debtors filed the instant adversary proceeding on October 14, 2005, a few months after converting to Chapter 7. The Debtors received a discharge on April 11, 2006.

I. <u>Mrs. Neal's Education and Work History</u>

Mrs. Neal is a 47 year old woman who, at the time the Debtors filed their bankruptcy petition, had been employed full-time for twelve years at Textron Automotive ("Textron"). She testified that prior to Textron she had worked in restaurants since 1979. Mrs. Neal had only a high school diploma, so she enrolled part-time at the New Hampshire Technical College to pursue a degree in computer studies. She was enrolled from July 1996 through May 1999. At trial, Mrs. Neal explained that she considered Textron to be a "dead end" job and hoped to get a management position once she received her degree. Toward this end, she took out six student loans in an aggregate original amount of $20,750. Mrs. Neal had difficulty with some classes and did not earn a degree, estimating that she completed about one-third of the requirements.

At some time post-petition, Mrs. Neal lost her job at Textron. From March 2003 until she was laid off in March 2004, she was employed at VisionTel Communications where she performed data entry for $10 per hour. Between November 2004 and February 2005, Mrs. Neal worked seventy-five hours per week at two jobs; at Wal-Mart she worked thirty-five hours a week as a cashier for $9 per hour, and at The Provider Enterprises, Inc. ("The Provider"), she worked as a bus driver forty hours per week at a rate of $9.50 per hour.[2] In February 2006, Mrs. Neal quit her job at The Provider, leaving her with a total current employment of thirty-two hours per week at Wal-Mart at the rate of $9.50 per hour. Mrs. Neal testified that she quit her job at The Provider, rather than quitting her Wal-Mart position, because she needed more time to care for her ailing husband and because she received health insurance through Wal-Mart, but not from The Provider. When asked by Defendant's counsel why she could not have kept her job at The Provider while reducing her hours at Wal-Mart (while still keeping her insurance through Wal-Mart), Mrs. Neal responded that working both a full-time job and a part-time job had gotten to be "too much," especially in light of her husband's

---

[2] In their joint pretrial statement, the parties stipulated to Mrs. Neal having worked seventy-five hours a week; forty hours at The Provider and thirty-five hours at Wal-Mart. However, at trial Mrs. Neal testified that she had been working twenty to twenty-five hours at Wal-Mart. Regardless, Mrs. Neal was working significantly more than full-time.

needs. She further testified that the particular work hours at The Provider— mornings—prevented her from helping her husband get out of bed and shower in the morning.

## II. Mr. Neal

On July 6, 2006, the Court approved a stipulation between Mr. Neal and the United States Department of Education (the "DOE") wherein the DOE granted Mr. Neal a conditional discharge of his student loan debt, "having found Mr. Neal disabled as of June 24, 2005." (Ct. Doc. No. 29). The DOE's discharge resulted in the dismissal of the instant adversary proceeding with regard to Mr. Neal's loans, leaving Mrs. Neal to argue undue hardship under section 523(a)(8). Although Mr. Neal's debt has been discharged, his health is material to Mrs. Neal's undue hardship determination insofar as Mrs. Neal argues that the number of hours she is able to work is limited by Mr. Neal's health care needs.

Mr. Neal has long been a diabetic, and in 1998, he suffered a back injury that has plagued him ever since (and which gave rise to the personal injury suit). Mr. Neal is now permanently disabled and suffering from a list of health problems, including diabetes, depression, obesity, and chronic back pain. Mrs. Neal credibly testified that Mr. Neal needs help with tasks such as dressing, showering, and cooking, and that he is unable to stand for any significant period of time. Mr. Neal was employed when the Debtors filed their bankruptcy petition and for a significant amount of time post-petition. His most recent employment, as shown on the amended Schedule I filed in August 2005 upon conversion to Chapter 7, was as a bus monitor with The Provider where his monthly net income was $387. Mr. Neal is no longer employed, and his current monthly net income is comprised solely of a Social Security disability benefit in the amount of $872.

## III. Income

As stated above, Mr. Neal's current income is $872 per month. Although Mrs. Neal's income has changed since her most recently filed Schedule I, copies of her Wal-Mart payment advices reveal her current income. (Pl. Ex. 1.) For a two-week period in which she was paid for 64.32 hours, her net pay was

$525.17.[3] The Court will consider her monthly net income to be twice her bi-weekly income and, thus, the Court finds that $1050.34 is her current monthly net income, which, when combined with that of Mr. Neal, yields a total combined monthly net income of $1,922.34.

## IV. Expenses

The Debtors filed a Schedule J when they first filed for bankruptcy and an amended Schedule J upon conversion to Chapter 7. The Debtors' current expenses, though, are found in Defendant's Exhibit 109, wherein the Debtors responded to the Defendant's interrogatory requesting a breakdown of the Debtors' expenses.[4] These expenses are as follows:

| Item | Amount |
|---|---|
| Rent | $850 |
| Telephone | 50 |
| Electricity | 200 |
| Cable Television | 97 |
| Car Insurance | 41 |
| Health Insurance | 82 |
| Prescription Drugs for Mr. Neal | 282 |
| Primary Vehicle Payment | 200[5] |
| Vehicle Maintenance | 30 |
| Gas & Oil | 100 |
| Registration & Tax | 15 |
| Groceries | 500 |
| Meals Eaten Out | 70 |
| Clothing & Shoes | 67 |
| Hair Care | 10 |
| Toiletries & Cosmetics | 10 |
| Pet Food & Care | 50 |
| Laundry & Dry Cleaning | 50 |
| Newspapers & Magazines | 10 |
| Total | $2,714 |

---

[3] The pay stub shows 61.93 hours for regular earnings and 2.39 hours for vacation pay. Although Mrs. Neal may not be paid for vacation pay every week, the total hours of 64.32 hours for a two-week period closely approximates the thirty-two hours per week that she testified to working.

[4] The parties stipulated to the admission of this exhibit.

[5] This figure was not provided in response to the interrogatory because Mrs. Neal has since had to replace her 1994 Dodge Spirit with a 1999 Ford Windstar for which she now makes a $200 monthly payment. Mr. Neal has a 1992 Chevrolet van.

**V. Repayment Efforts**

The Debtors have never made a payment toward Mrs. Neal's student loans. According to the Defendant, monthly payments were to begin on January 5, 2000, and sometime during 2000 Mrs. Neal applied for, and obtained, a no-pay forbearance that resulted in her loans being deemed current on the petition date. The Debtors planned to pay the student loans with the proceeds of the Connecticut personal injury suit and, had the Debtors completed their Chapter 13 plan, the loans would have been paid in their entirety. The Debtors did make at least forty-seven monthly plan payments, and Mrs. Neal testified that she thought that the Defendant was being paid by the Chapter 13 trustee's disbursements to creditors.

## DISCUSSION

Student loan debt is not routinely discharged in bankruptcy. Student loan debt is not discharged "unless excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). To determine undue hardship, this Court employs the three-part test set forth in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2nd Cir. 1987). See, e.g., Grigas v. Sallie Mae Servicing Corp. (In re Grigas), 252 B.R. 866 (Bankr. D.N.H. 2000); In re Garrett, 180 B.R. 358 (Bankr. D.N.H. 1995). The Brunner test requires the following showing: "(1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans." Brunner, 831 F.2d at 396.

To satisfy the first Brunner prong, the Debtors must demonstrate that even after maximizing their income and minimizing their expenses they would be unable to repay the student loans while maintaining a minimal standard of living. See In re Hambacher, 2005 WL 3307063, at *3 (Bankr. M.D.N.C. 2005). As for expenses, none of the expenses listed above raise serious concerns with the Court. There are no unnecessary living expenses such as a vacation timeshare, see In re Kehler, 326 B.R. 142, 149 (Bankr. N.D. Ind. 2005),

and there are no vices such as cigarettes that debtors are routinely allowed. See, e.g., In re Hertzel, 329 B.R. 221, 229 (6th Cir. 2005). The Debtors live a frugal lifestyle. Potentially quarrelsome expenses, such as $97 per month for cable television, are not lavish in light of Mr. Neal's condition and the minimal recreational or entertainment expenses claimed. The Defendant's only apparent objection to the expenses is that the Debtors' expenses have fluctuated over the years in step with the Debtors' fluctuating income. Specifically, the Defendant points out that the Debtors' current expenses are $771 less than the Debtors listed in August 2005, when Mrs. Neal was working two jobs. Regardless, the Debtors' current expenses are reasonable.

Turning to income, Mr. Neal receives $872 per month in disability benefits, and, based on her payment advice, Mrs. Neal nets approximately $1,050 per month working thirty-two hours a week at Wal-Mart, for a total of $1,922. The Debtors thus have a negative monthly cash flow of approximately $790. The Court agrees with the Defendant that Mrs. Neal is not maximizing her earning capacity. The Defendant proposes that Mrs. Neal work a full-time job and a part-time job, similar to what she had done prior to quitting her job at The Provider. However, the Court disagrees that Mrs. Neal is required to work both a full-time job and a part-time job. As for hourly pay, it is unlikely that Mrs. Neal would succeed in finding significantly higher-paying employment than the $9.50 per hour (plus insurance) she currently earns at Wal-Mart. All of her previous positions discussed above have been in the $9 to $11 range, and she never completed her computer studies degree. The Court concludes that under the facts of this case forty hours per week at $10 per hour would constitute maximization of Mrs. Neal's income.

Mrs. Neal's bi-weekly take home pay based on $9.50 per hour and thirty-two hours per week is approximately $525. If Mrs. Neal worked forty hours per week at $10 per hour, she would net approximately $1,376 per month.[6] When Mr. Neal's $872 is added to this, the Debtors have the capacity to net $2,248 per month. However, the Debtors would still have a negative monthly cash flow of

---

[6] Currently, she takes home $525 every two weeks, or $1,050 monthly. After deductions are taken out by her employer, she nets about $8.20 per hour. Adjusting this figure to a gross hourly pay of $10 yields about $8.60 per hour. $8.60 multiplied by forty hours equals $344 per week, which multiplied by four weeks equals roughly $1,376 per month.

approximately $466. If the Debtors were forced to repay the student loans, based on their current expenses and either their current or maximized income, the Debtors would be unable to maintain a minimal lifestyle. The Debtors have satisfied the first Brunner prong.

The second prong considers whether "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." Brunner, 831 F.2d at 396. "These additional circumstances must be 'extraordinary and exceptional and generally indicate a hopelessness for the indefinite future as to any possibility of repayment.'" McClain v. Am. Student Assistance (In re McClain), 272 B.R. 42, 48 (Bankr. D.N.H. 2002) (quoting Keilig v. Massachusetts Higher Educ. Assistance Corp. (In re LaFlamme), 188 B.R. 867, 871 (Bankr. D.N.H. 1995)). As for Mr. Neal, no evidence has been presented showing that he is likely to receive more than the $872 he currently receives. It is evident from the schedules filed throughout the pendency of the bankruptcy case that Mr. Neal's ability to earn income has steadily decreased. When the Debtors filed their case in 2000, Schedule I listed his gross income as $1,400 per month. Upon conversion to Chapter 7 in 2005, an updated Schedule I listed his gross income as $512 per month. Now Mr. Neal's income is solely comprised of disability benefits. Mrs. Neal could work more than thirty-two hours per week, as discussed above, but, based on her employment history and education, she is not underemployed with regard to the type of work she does. While she has worked as many as seventy-five hours per week in the past, the Court will not require, and the Code does not require, that a debtor, in order to establish undue hardship, prove that even after working seventy-five hours a week she is unable to pay her student loans. Absent truly exceptional circumstances, though, a debtor must work full-time, or forty hours a week. Mrs. Neal has not demonstrated an inability to do so, but she has credibly testified that the number of hours that she can work is limited by her husband's health condition.

The Debtors' foreseeable financial future indicates continued financial hopelessness with regard to their ability to repay the student loans. Mr. Neal's health is an extraordinary circumstance that limits both

himself and Mrs. Neal.  Even putting aside the demands of his health on Mrs. Neal, Mrs. Neal is at or near the apex of her earning capacity.  The Court finds that the Debtors have satisfied the second <u>Brunner</u> prong.

The third part of the <u>Brunner</u> test considers whether the Debtors have made a good faith effort to repay the loans.  Two hallmarks of a debtor's good faith are making monthly payments and/or attempting to negotiate an alternative payment plan with the lender.  <u>See</u> <u>In re Garrett</u>, 180 B.R. at 364 ("The record is devoid of any payment made by Garrett on these loans or even any attempt to enter into a repayment schedule with the Defendants."); <u>In re Grigas</u>, 252 B.R. at 875 (finding good faith in debtor's efforts to restructure the loans and making intermittent payments when she had the funds).  In the instant case, the Debtors did not make any loan payments and there is no evidence that they contacted the Defendant to work out an alternative payment plan.  The only pre-petition attention given to the loans appears to be Mrs. Neal's application for a no-pay forbearance.  According to the Defendant, the forbearance was granted, resulting in the loans being deemed current on the date the Debtors filed their bankruptcy petition.  The Debtors' actions, though, do not indicate an eagerness to duck their student loan obligations.  While the loans were in forbearance the Debtors filed their Chapter 13 petition.  The Debtors proposed paying the obligations in full with the proceeds of the Connecticut personal injury suit.  Mrs. Neal's uncontroverted testimony is that the Connecticut attorney dropped the ball and the Debtors are now without recourse.  While the Debtors were in Chapter 13, they devoted all of their disposable income, as determined with reference to Schedules I and J, to the plan.  They ended up making at least forty-seven payments.  Mrs. Neal also testified that the Debtors erroneously assumed that the Defendant was taking part in the Chapter 13 trustee's distributions to creditors.  The Debtors only converted to Chapter 7 when the Connecticut lawsuit fell through.  It was not until they were in Chapter 7, more than four years into the bankruptcy process and after Mr. Neal's earning capacity declined, that the Debtors challenged the dischargeability of their student loans.  Prior to that time, the Debtors acted in good faith, looking toward paying off their loans.  Given the facts of this case, the Court finds that the Debtors have satisfied the third prong of <u>Brunner</u>.

## CONCLUSION

The Court holds that excepting the student loan debts from discharge would impose an undue hardship on the Debtors, and, therefore, Mrs. Neal's student loan debts will be discharged. The Debtors simply do not, and will not, have the ability to repay the debts. This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a final judgment consistent with this opinion.

DATED this 28th day of November, 2006, at Manchester, New Hampshire.

/s/ Mark W. Vaughn
Mark W. Vaughn
Chief Judge